In the summary judgment to the individual officers on the qualified immunity, the trial court, as its basis for denial, stated that there were disputed facts and differing accounts of what occurred leading up to the use of force, particularly with regard to Plaintiff's actions and the impact those actions had on the officers. The order does not provide any specific example of those disputed facts and does not cite to a specific disputed fact. Is it therefore not appealable? Should this be immediate? We have several cases where we immediately remand because the court is supposed to find the facts, you know, favorable in this case to the other side. And our position in this in this instance, your honor, is that when the court reads the statement of facts and the undisputed admissions made to those facts, that the material facts are not in dispute and therefore it becomes a question of law for this court. And a review beginning at page 42 of the appendix and the admissions to those statements of fact, which are at page 202 of the appendix, clearly demonstrate this point. They establish the reason that the officers were at the scene. They establish that the father of the appellee was the one who called them, asked them to come because his son was off his meds, had a serious issue, and would not voluntarily seek treatment. When dispatch asked if Plaintiff was hostile or could be violent, his father noted that he had not been violent that day but could possibly become violent. These are all admitted. The dispatch reported that Mr. Cravener indicated his son was diagnosed as a paranoid schizophrenic with erratic behavior with possible medication issues and reported that Cravener's statements to the effect that Plaintiff was not in his right state of mind was talking to the walls and might become combative when he realized what was going on. It's admitted that when Deputy Schuster arrived at the residence, he met with the father who stated that he wanted to get his son a 48-hour observation. It's undisputed that Deputy Schuster could hear Plaintiff's voice coming from the other room saying, I love Satan. When asked, Plaintiff stated that he was not on his meds and had not taken his schizophrenia medicine in the last two days. Deputy Schuster explained to Plaintiff that his parents were concerned with the way he was acting and then he started talking about chemical burns on his skin. We have all read the briefs. Thank you, Your Honor. What's the closest case? It depends on which issue we're addressing. What do you think is your best issue? I think all of my issues are good issues. Oh, counsel, you keep dodging. What's your best argument in your best case? Well, my best argument is that there is absolutely no difference in this case in terms of the level of resistance to the Elders case where the gentleman was walking away from the officers at the time the officers attempted the arrest, that he did similar things to what the plaintiff did in this case. He wouldn't offer his arms up. He wouldn't surrender to their request that he give them his hands to cuff. And in doing so, then the officers took him to the ground with an arm bar technique. This is what case again? The Elders. It's in the briefs, but it's 846 F. 3rd 1002. There are other similar cases that we've cited, in terms of the level of resistance, in terms of the issue of the severity of the injury being a factor. We've asked the court to consider Ryan versus Armstrong, which in that case, the plaintiff actually died. What catches everybody's eye on this court, at least these days, is the taser. Did you take count of how many published taser opinions we've filed in the last two or three years? I know there have been many taser cases. Well, what's the score? I don't know the answer. Well, what's the standard for qualified immunity? It's beyond debate, right? Why wouldn't you toad up the score on something as persistently raised as tasing? I mean, the armbar, sure, you say it's a standard attack defense tactic, and I think, as far as I know, that's right. It's the tasing that catches everybody's eye, and you don't talk about it. Well, I guess. It's tased multiple times, right? Five times? Five times. I guess the reason the focus has been on the other issue is the fact that there's been no indication that any harm came from the tasing. It doesn't have to be harm. Haven't you read our cases? I understand, Your Honor. So with respect to the tasing, what I can say is that he was, at that point, actively resisting the arrest, and he was warned that if he didn't stop doing so, that he would be tased. Which you think is the closest taser case? Well, you talk about the boys in the brief, because that was another schizophrenic, but it was a far more violent situation. So don't say that one. Golden Valley had a tasing, didn't it? A woman on the phone who wouldn't pay attention to policemen. Your Honor? The Golden Valley case, the passenger sitting there won't pay attention to policemen on the phone. They tase her. She was just sitting there talking on the phone. Johnson, I think it was. But that was the classic non-resister. In this case, by the time Then we have the farmer and his son who were holding stray cattle and didn't want the investigators to nose around. Completely innocent conduct, but noncompliance with commands resulted in tasing. Have you read ProSART? It's in the last eight months, probably. I would say in this instance, Your Honor, the difference is that the tasing did not was upheld. Are you arguing now for plaintiff? No, Your Honor. You should be looking for taser cases where someone who was not engaged in criminal activity, but was refusing commands or resisting compliance, was tased and we upheld the grant of qualified immunity or we reversed its denial. Those are the cases you should care about. Do they exist? Yes. Are they cited other than Du Bois? No. That's true. The focus was not on the tasing in the briefing. What I would suggest with respect to the tasing is that the tasing did not occur until he was clearly physically resisting arrest and they still could not obtain control. Our case law is clearly on your side with tasing, our very recent case law. You've got, you've found our arm bar cases, but arm bar doesn't doesn't raise eyebrows like tasing does because there's quite a bit of scientific and medical evidence that that particularly in in in stun mode, it's a dangerous device. And that's the way it was used here. I understand the focus of the briefing on both sides was probably not directed as it should have been to the tasing issue. The focus was the broken arm. Because that was the most severe personal. That's correct. There was a personal injury, right? Physical injury. I said it right. Yes, your honor. Yeah. With respect to, I would ask the court to consider one other thing in terms of the officer Maggard. Officer Maggard was left in the case and yet he had no involvement in any of the tactics that were used. He didn't tase. He didn't implement the arm bar technique. He remains in the case and to the extent that it's based upon a failure to intervene, we would respectfully suggest that pleadings didn't raise a failure to intervene and to the extent that it did, certainly with respect to the arm bar technique, it happened so quickly that he wouldn't have had an opportunity to respond even had he thought there was something wrong. But the more important point is that we do not believe that there was anything that occurred that would constitute force that this officer, this standby officer, would have seen as an excessive use of force that required intervention. You say it wasn't pled. There's no failure to intervene that's pled. I don't believe there is. The appellee makes a reference to his very beginning paragraph of the complaint and says it's pled there, but it certainly isn't in the body of the complaint. We didn't know that he was making the allegation. Was the denial of qualified immunity based on non-intervention? I don't know. That brings to mind a question that I've had all along is that if you look at the precedent in Hant v. Lynch, there has to be some sort of a discussion that's individualized to each individual defendant so that you can actually review it on appeal. Now, in response to Judge Benton's first question, you said you don't think it needs to go back for a more definite statement from the trial judge because if we look at the record that the facts are actually undisputed. And so my question is whether it was discussed or not discussed, what do the facts show that Mattern was doing? Because I think what you're asking us to do is to look at the underlying facts and not bother to send it back even though on its face this particular opinion does not perform any individualized examination of the conduct on their named defendants. That is correct. In that point, Your Honor, not only do the underlying facts and the admissions support a finding in Mr. Maggard's favor, but even the limited denial that was made to the statement of facts was to deny that Maggard had any involvement in attempting to take plaintiff to the ground, which was our request for admission number 20, which he admitted Schuster took him down and Maggard did not. So the record, the facts that have been admitted demonstrate that Maggard was nothing more than a standby officer and had no physical involvement with the appellee. And so then Schuster's involvement was with the arm bar, the circumstances surrounding the breaking of the arm, that's not relevant in your analysis? Because it just happened, it was an accident, what's your position as far as Schuster's concerned? Well, that is the position that he was taking what he believed to be appropriate action and unfortunately an accident did occur. And this is a known risk when someone is putting an arm bar hold? Well, I don't know the answer to that. I know that in this instance it happened and the undisputed evidence is that it happened as a result of the appellee resisting back against the arm bar technique. And that under your analysis would happen in the absence of any excessive force? Yes, Your Honor. And what about Calvin? Calvin was, he was the one who did the five stun guns after warning. And your argument is essentially that it's similar to versus Jahnke and cases like that or you just haven't looked at them? My argument is simply that it wasn't, they didn't take it to that level, that was the next level of force they implemented when he still was resisting arrest even after his arm had broken. And so on a use of force analysis, you use escalating force in order to subdue a resisting suspect or a person who's needing to be taken to custody and all steps up to that were reasonable. That's your argument? Yes, Your Honor. All right. Thank you. Thank you. Mr. Potter. Thank you, Your Honor. May it please the Court. Counsel. I believe that there's a difference in this case than some of the President that is currently here in the Eighth Circuit. And I think the difference in this case does not require that there be necessarily a precedent to determine if there was, in fact, a constitutional violation. The issue at hand. Wait a minute. That's what qualified immunity is all about, isn't it? What statutory, federal statutory liability is asserted? Well, this is an excessive force claim that a person is free from excessive force. It's not. You have no 1983 claim unless it's a Fourth Amendment-based claim. No, and I agree with you, Your Honor. My point is simply that there is not a case exactly on point to this one. What's the closest one? I think the case that helps me the most, the Cyrus is on point. I think Durrell really sets the stage because what's really going on here, we have in this case, and I think Graham versus Connor helps me on this case. In this case, we have an individual in need of mental help. Nobody disputes that. The difference with his situation when the officers arrive, and the other cases cited by the defendants in this case, is that he is simply sitting in his room being passive. Most all the other cases. I'm going to take you to where you don't want to go. I want to start you where you don't want to start. Thank you. In my view, in order to avoid reversal in this case, you have to convince me that Maggard did not, that the facts, undisputed facts, or disputed facts, don't entitle Maggard to qualified immunity. That his role in this was excessive force beyond the precedential debate. Maggard being the third of the three officers that did not do that? That held the right shoulder while the arm broke and the tasing occurred, and without discussion was denied qualified immunity by the district court. Unless you can individualize the facts so that Maggard doesn't get qualified immunity, we must reverse, as I read our precedents. Okay. Maggard, in my opinion, falls into what the courts have been saying since approximately 2001, or at least recognizing. Recognizing that when we deal with a mental person in need of care, that there has to be some extra care given to them. Let me finish. I'm not avoiding your question. In this case, we have three gentlemen that show up at a room, all of the same qualifications, apparently, by their testimony. With no indication, or a plan, or discussions of anyone outside that room, how they're going to deal with this gentleman, who does not want to go to the hospital, is not causing harm. Maggard, in my opinion, like the other two officers, showed, not to jump ahead, but he was deliberately indifferent and showed no due course in considering this man's mental health. That's not an excessive force claim. It's some kind, I mean, I certainly understand the logic of the theory, but it's not an excessive force theory. Well, my theory is that his failure to intervene is what. But that's not, that's not, Pledna was not the basis of the district court's ruling. We can't make that up. I mean, at a minimum, it's a reverse in remand. As to Maggard, yes. Well, and as to Calvin, our recent tasing cases clearly put his use of a taser not beyond debate. The son in Prosart, sitting in the squad car and refusing to move over because they're in the midst of a non-complying event, and he gets tased until, of course, he moves over and it hurt, because it hurt. And see, my position is, which is what I've indicated in my brief, is that the Prosart is somewhat different than this case. And for reason being. Father, I would agree, but not the son. The son is probably a less reasonable use of the taser than Calvin's. My, my position is, is simply that once we have a situation where someone is in need of medical treatment, I mean, they've agreed that they're caregivers in this instance. They briefed that, that they're a caregiver. There's no indication that you're trying to provide care. They're just simply taking in someone that would be no different than any criminal suspect. My client didn't commit a crime. He did not. Okay, but the excessive force cases are, are, are, do not support. That's not an excessive force theory. We have, we have Du Bois. We, I mean, we have, we have violent or resisting mental health patients who are killed. Oh, I. By law enforcement officers, and, and situations are never identical. I, you know, that. Well, and I agree. But the, but the unreasonableness has to be beyond debate. And, and I, and I agree with Du Bois being a case. But that's my, in my opinion, based on what I started to say initially, is that Du Bois is completely different than this case. So, and, and this case is similar to Cyrus, except my guy didn't even leave the house. My guy simply was schizophrenic. He needed medical treatment. An arm bar was used upon him. His arm broke. He's on the floor. And then there's a five round of a taser used upon him. Which, in, in my opinion, at that point, given what we knew about what was going into this at the very outset, that that's more of a gratuitous use of force at that point than a force that's going to do anything to resolve the situation. These gentlemen had an ambulance sitting outside this, my client's home, or the home he was at, and asked no one for assistance until after they were holding him down, someone came in and gave him a sedative, which is what got him out of the room to begin with. None of that was considered at the outset. And I think that's where the, where the wall is headed. Do I understand the facts to be that there is, there is no witness to the level of resistance and the force techniques applied other than the officers? Because Creevener doesn't remember and his parents were not there. He does not. The parents were kept in the other room by another officer. That's correct. You are correct. So where were the facts disputed? Well, and this is, I think this is what Judge, well, I'm going to avoid your question. There were very little facts actually disputed with the, with some exceptions that may be important to the decision in the case. Those being that my client, left out of the facts presented to the court, was that my client was polite, sitting down, not making any harms to anyone. The officer said there was no harm that he presented to anyone. There was one dispute, in fact, that one officer said the protocol was to not do anything until the scene was completely cleared before medical personnel was allowed to come in. Another officer said he'd seen medical personnel come into a room like this before and assist officers in administering aid or treatment or counseling, whatever it may be. So those facts are in dispute. Otherwise, the facts are not really in dispute. Now, Judge Wimes, I believe correctly, could have determined that the facts that everybody agreed upon could be perceived entirely different by a jury in making a determination whether or not an officer was. That's always true, but the qualified immunity is left to the judge. I agree with that. I don't dispute that statement at all. And I'm not here to dispute that statement. I'm just saying that's my perception of how he drafted his order in this case. Mm-hmm. And so essentially, as I understand your argument, the officers are on the scene in a caretaker function, and they're there on a wellness check. They're informed that your client is suffering from a psychotic break, that he is not violent, but that he is sitting in his room talking to the walls, and that he is likely to become resistant if they try and take him into custody. The police arrive at the scene. The three officers go back into the bedroom. They find your client talking to the wall. He's overheard to say strange things like, I believe, I love Satan or something. They get in there. They have a brief conversation. They ask him to put out his hands. He refuses to put out his hands. So the officers are going to try and take his hands so they get him handcuffed and they get him in the squad car and get him someplace where he can be seen by professionals. That's the background, right? With a little bit of a caveat. I don't disagree with anything you've stated except that at the outset when the decision was made by Schuster to do the armbar, no one even knew that was going to take place. Well, I'd add a modifier. I don't understand it was a wellness check. I understand that the father said that he needs hospitalization. That's true. And I dare say Missouri law would allow his seizure for that purpose in this situation. I didn't research that. Is that wrong? I'm not sure it's clear. Well, is the father a custodian? No, he's not. He's not. They arrived at the scene purely at a medical request. The facts are clear that he wanted his son to go get medical treatment. He was recommended. The paramedics were there to take him to an institution. I mean, hospital, whatever, right? Well, they were there. They were never involved in this until after his arm was broken. He needed to be taken somewhere for that. They were there because of the call from the father. I believe. They weren't there at the request of the police to back up. The police were there. I don't believe so. They were there. They were the primary people with the police, as I understand county protocol has described, the police being the ones who are to secure the situation before the paramedics possibly place themselves at risk. Well, the protocol testified by one was that another officer said he had seen medical personnel. I'm not surprised. But given what given what father told the dispatcher that he's off his meds and he can become violent when he's off his meds because he's a paranoid schizophrenic. Is it surprising that they're there, that there are security precautions taken and that they're there to get him to medical professionals who can decide whether he's off his meds and needs to get on them? I think that's why they I think that's why they were there. And I think, though, that the case law from. So the plan to go in the room, it seems to me, is you're collapsing the priorities and responsibilities of multiple agents. The paramedics and the law enforcement people. I don't understand the term collapsing, except to the extent that they're there. The police officers aren't there to do the to do the medical evaluation and the transporting to a hospital. They're there to secure the scene. And I think I think I actually agree with you with your statement, except to the extent that I think officers should have involved or at least asked what to do, given they had a person that was nonresistant sitting in front. Hindsight is great. They could have said to the medic, this sounds like one where you ought to come with us. And I think hindsight would be not allowed in any case. It was a quickly evolving set of facts, but these were not quickly evolving. They were in the room. Here's the thing. Mere negligence isn't going to get you anywhere. And if the officers were negligence in initiating a contact with Mr. Cravener, there's just mere negligence, right? But once you've actually made physical contact and resistance starts to play out, then there's an escalation of force that's placed on your client. And escalation of force is driven by a number of things. One is the level of resistance that your client has. And two, the increasing level of fear that the officers have, right? I mean, anytime you have a person who's talking to walls and is resistant, and you're an armed person, you're physically at risk of being killed. We know that most officers are killed by their own weapons, right? I mean, that's just statistically a fact in this country. And so once the contact's made and once there's resistance, then when does the force actually become excessive? Or is the excessive force at the very moment that the first physical contact is made? See, and I think the distinction in this case is similar to what they recognized in Durrell. And Durrell simply says, we're in an environment now. We know that there are mentally disturbed people out there. And that officers reasonably should expect that if they use force in a certain way, it will escalate the situation. Which is why we involve all kinds of different personnel, whether it be ambulance, whether it be psychiatrist, or somebody that knows what they're doing. I think that's the point of this case. The officers did know what to do with this guy. And they made no effort to determine what to do, knowing full well the law is recognized when you escalate force or use force on somebody mentally disturbed. But they can resist. I'm looking in your table of authorities, and I don't see the case you're talking about. Durrell versus Rutherford out of the Ninth Circuit. I actually called. Oh, okay. I actually quote a long passage out of that case about the status of what's going on with mentally disturbed people dating back to 2001. So it's not a controlling case. I don't even know if it discusses qualified immunity. It's our controlling qualified immunity cases that matter here, matter the most. Well, controlling is to the... Sorry, but I... Even if we thought it was persuasive, if it's inconsistent with our authorities, our panel has to follow our cases. I agree with that. But I'm not sure it's really inconsistent with what the 8th Circuit's done before in this particular scenario. That's my point. Well, and then I had the case with the psychotic woman in the drugstore who was tased and then shot because she wouldn't... She scared the clerk. The other customers ran from the store. She was standing by a restroom that might be occupied. And she wouldn't put down her knife. My client didn't have a knife, Your Honor. And he was not in a public place. He posed no immediate threat to anyone at the particular time he was there. But it was a place the officers were assigned to be. I mean, the fear there was that the public place didn't matter as much as the threat that she posed to the officers. And she had a knife. Yeah. It's the father's home here, right? I'm assuming the whole time. He owns the property. Right. The father who called the police owns the property. Yeah, yeah. Thank you, Your Honor. Thank you, Your Honor. My time is nearly up, but I'm happy to try to answer any questions. I'll try to do better than I did in the opening. I did look at the... We briefed it better at the summary judgment level than perhaps we did at this court in terms of the tasing. But really, no cases that are in the brief that you haven't already discussed, Dubois. And I guess to answer your question, Judge, I would say Ryan versus Ferguson and Ellers are our two best cases. Thank you. Thank you. Thank you, counsel. The case has been well briefed and argued, and we'll take it under advisement.